IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2015 JAN 22   AM 10: 24

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
          DEPUTY

WAVETRONIX LLC,

                **Plaintiff,**

-vs-                                                          **Case No.  A-14-CA-970-SS**

ITERIS, INC.,

                **Defendant.**

## O R D E R

BE IT REMEMBERED on the 24th day of November the Court held a hearing in the above-styled cause on Plaintiff Wavetronix LLC's Motion for Preliminary Injunction [#15] (sealed),[1] to which Defendant Iteris, Inc. filed an Opposition [#33] (sealed), and to which Plaintiff filed a Reply [#37-1] (sealed).[2] The parties appeared by and through counsel, and the Court heard several hours of testimony and argument. Having reviewed the documents, the governing law, the testimony at the hearing, the supplemental letter briefs thereafter filed by the parties [##45, 46], and the file as a whole, the Court now enters the following opinion and orders DENYING the motion WITHOUT PREJUDICE.

### Background

This is a patent infringement action concerning two products designed to address what is known as "the dilemma zone problem," a longstanding issue in the traffic-control field. The

---

[1] All of the pleadings relevant to this motion, save one exhibit to Iteris's Opposition and the supplemental letter briefs, have been filed under seal. The Court will refer to a sealed pleading as sealed only in the first citation thereto.

[2] Wavetronix's Motion for Leave to File Reply Brief in Support of Motion for Preliminary Injunction Under Seal [#37] is GRANTED.

dilemma zone problem arises when a driver is approaching an intersection and the traffic light turns yellow at a moment when the driver is too close to the intersection to comfortably stop the car, yet too far from the intersection to comfortably pass through before the traffic light turns red. The driver is thus faced with the "dilemma" whether to hit the gas or the brakes, increasing the likelihood of a broadside (if the driver hits the gas) or rear-end (if the driver hits the brakes) collision with another vehicle. The dilemma zone is generally defined in the art as the time when an oncoming vehicle is between 2.5 and 5 seconds from the stop bar. *See* Pl.'s Mot. Prelim. Inj. [#15] at 3; Def.'s Opp'n [#33] at 2.[3] The stop bar is the pavement marking indicating the point behind which vehicles approaching the intersection must stop if the traffic light is red.

Wavetronix is the holder of U.S. Patent No. 7,991,542 (the '542 Patent), which covers the Wavetronix SmartSensor Advance (Advance), Wavetronix's "dynamic" dilemma zone protection invention. Wavetronix applied for the '542 Patent in March 2006 and received it in August 2011. Using radar, the Advance tracks the speed and location of vehicles approaching an intersection in real time (dynamically), uses that data to calculate each vehicle's estimated time of arrival (ETA) at the stop bar, and thereby determines whether any of the approaching vehicles fall within the dilemma zone. If vehicles fall within the dilemma zone, the Advance sends a "call" to the traffic controller, telling the traffic controller the traffic light ought to remain green rather than turn yellow such that cars may comfortably and safely pass through the intersection.

Wavetronix alleges Iteris's competing dilemma zone protection device, the Vantage Vector,

---

[3] Iteris describes the dilemma zone as the time when an oncoming vehicle is "between 2.5 and 5.5 seconds" from the stop bar. Def.'s Opp'n [#33] at 2. The 0.5-second difference between the parties' description of the second threshold is not material to the Court's decision on this motion.

infringes the '542 Patent.[4]  Like the Advance, the Vantage Vector uses radar to track the speed and location of vehicles approaching an intersection in real time, determines whether oncoming vehicles fall within the dilemma zone, and, if so, "calls" the traffic controller to tell it the light ought to remain green rather than turn yellow.  The key dispute between the parties concerns what the Vantage Vector does with the speed and location data it collects and, relatedly, how the Vantage Vector defines the dilemma zone.  According to Iteris, the Vantage Vector, in contrast to the Advance, never calculates any vehicle's ETA at the stop bar or uses ETA in any other way.  Rather, the Vantage Vector merely "compares" the speed and distance data it collects to speed and distance thresholds configured by the end user—typically a city, county, or state traffic agency—and it is those user-defined thresholds, not any specific window of time, which define the dilemma zone. Def.'s Opp'n [#33] at 2.

Wavetronix and Iteris are currently the only two suppliers competing for Texas job contracts requiring radar-based dynamic dilemma zone protection, as the Advance and the Vantage Vector are the only two products which meet the Texas Department of Transportation's specifications for radar-based dynamic dilemma zone protection devices.  *See* Prelim. Inj. Hr'g Ex. P-5 (TxDOT Specification TO-8000).  In Wavetronix's view, "Iteris is trying to buy market share in the market built by Wavetronix by selling the infringing Vantage Vector at deeply discounted prices." Pl.'s Mot. Prelim. Inj. [#15] at 8.  Wavetronix further claims Iteris "has adopted a strategy" of inducing contractors who previously awarded bids to Wavetronix to switch to the Vantage Vector by offering a far lower price, and alleges Iteris has already successfully stolen several of its customers.

---

[4] The Vantage Vector has a number of different modes—trip line mode, group mode, and continuous mode. *See* Def.'s Opp'n [#33] at 2 n.2.  Wavetronix alleges the Vantage Vector infringes only when operated in continuous mode.

Wavetronix filed suit against Iteris on October 24, 2014, and moved for a preliminary injunction that same day. *See* Compl. [#1]; Pl.'s Mot. Leave [#2].

## Analysis

### I.      Legal Standard

A party seeking a preliminary injunction must satisfy each of four criteria: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) the substantial injury outweighs the threatened harm to the party against whom the injunction is sought, and (4) granting the injunction will not disserve the public interest. *Planned Parenthood Ass'n of Hidalgo Cnty., Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). "'[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.'" *Id.* (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)).

### II.     Application

The Court finds Wavetronix is not entitled to a preliminary injunction because although it has shown a likelihood of success on the merits, it has failed on the present record to carry its burden to show a substantial threat of irreparable injury, a favorable balancing of the hardships imposed by an injunction, or that granting an injunction will not disserve the public interest. The Court therefore denies the motion without prejudice to Wavetronix's right to re-file for injunctive relief along with any motion for summary judgment following the *Markman* hearing in this case.

### A.      Likelihood of Success on the Merits

In order to demonstrate a likelihood of success on the merits, a patentee must prove "success in establishing infringement is 'more likely than not.'" *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748

F.3d 1159, 1166 (Fed. Cir. 2014) (quoting *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525–26 (Fed. Cir. 2012)).  In making that determination, courts may construe disputed claim language. *Sofamore Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1220 (Fed. Cir. 1996) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)).  Claim construction at the preliminary injunction stage, however, may be incomplete and tentative. *Jack Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).  Following claim construction, the court determines whether the accused device is likely to fall within the scope of the claims. *Sofamore Danek Grp.*, 74 F.3d at 1220.  To infringe, the accused device must embody each claim limitation or its equivalent. *Id.* (citing *Charles Greiner & Co. v. Mari-Med. Mfg., Inc.*, 962 F.2d 1021, 1034 (Fed. Cir. 1992)).  Further, "[a] patent holder seeking a preliminary injunction bears the ultimate burden of establishing a likelihood of success on the merits with respect to the patent's validity." *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009).

    **1.**       **Infringement**

Although Wavetronix's Complaint alleges the Vantage Vector infringes four claims of the '542 Patent, it discusses only one of the four claims, Claim 1, in its motion for preliminary injunction.  Claim 1 states:

> 1.     At a roadway mounted sensor, the roadway mounted sensor monitoring vehicles on a portion of a roadway, a method for monitoring a signalized traffic flow, the method comprising:
>
> > [a]     an act of receiving sensor data, the sensor data indicating the presence of one or more vehicles within a continuous range of the monitored portion of the roadway, the received sensor data representing a portion of a signal that was transmitted by the roadway sensor into the portion of the roadway;

[b]     an act of *using the received sensor data to determine estimated times-of-arrival* of the one or more vehicles to a traffic control point associated with the monitored portion of the roadway, two or more times while the one or more vehicles are within the continuous range;

[c]     an act of determining a level of efficiency and safety for the traffic flow within the vicinity of the traffic control point *based upon the estimated times-of-arrival*; and

[d]     an act of reporting the level of efficiency and safety to a traffic control unit that is actively controlling the monitored signalized traffic flow.

Prelim. Inj. Hr'g Ex. P-1 ('542 Patent) at 28:40–60 (emphasis added).

The parties' key dispute concerns what it means for a device to "determine" a vehicle's "estimated time[]-of-arrival" at a traffic control point (such as an intersection's stop bar).  As previously noted, Iteris argues the Vantage Vector never "determines" a vehicle's ETA because it never calculates one; rather, end users are responsible for defining the boundaries of the dilemma zone by inputting certain speed and location values into the Vantage Vector, and the Vantage Vector does nothing more than compare the speed and location data it collects to the user-defined zone.

As this case is in its infancy, the Court lacks the benefit of a *Markman* order construing the claim language disputed by the parties.  The Court thus looks to the words of the claims, the plain and ordinary meaning of those words, and the teachings of the specification, emphasizing that claim construction at this stage of the proceedings is preliminary.  *See, e.g., Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005) (recognizing the need, during development of a full record, to revisit claim construction conducted during preliminary proceedings).  Unfortunately, neither party has proffered a basic, straightforward statement of its position concerning the definition of "determine" as used in the '542 Patent.  Rather, both parties shape their

-6-

arguments indirectly, providing examples of what the Vantage Vector does and does not do and inviting the Court to connect the dots. Much discussion at the hearing, for example, was devoted to the proper interpretation of the following diagram, created by Iteris and found in the Vantage Vector User Guide:



Prelim. Inj. Hr'g Ex. P-4 (Vantage Vector User Guide) at 27.

The diagram depicts how the Vantage Vector creates a dilemma zone and what occurs when vehicles are inside the zone. As shown, the two sloped lines demarcate the beginning and end of the dilemma zone, and when a vehicle is within the zone, the Vantage Vector places a call to the traffic controller. Immediately below the diagram, the Vantage Vector User Guide directs users to a table of speed and distance values which, if inputted into the Vantage Vector, will cause the Vantage Vector to create a dilemma zone as it is typically defined in the art: a zone within which approaching

vehicles will have an ETA of between 2.5 and 5 seconds.[5] *Id.* at 27–28 (stating the user should consult the table "for speeds necessary to travel a certain distance *in a certain time*" using "the typical dilemma zone definition of a vehicle *being between 2.5 sec and 5 sec*" (emphasis added)). The Vantage Vector creates a 2.5–5-second dilemma zone by default.[6]

Wavetronix argues the diagram shows the Vantage Vector *must* determine the ETA of vehicles approaching an intersection because the art defines the dilemma zone in terms of time; thus, even if the Vantage Vector does not *calculate* ETA, it still *determines* ETA, because the moment a vehicle crosses one of the two sloped lines as shown in the diagram, the Vantage Vector has "determined" the vehicle is somewhere between 2.5 and 5 seconds from a traffic control point. Iteris counters that the only inputs accepted by the Vantage Vector are speed and distance thresholds[7]—nothing concerning time—and the fact there is a mathematical relationship between speed, distance, and time "does not mean that [the Vantage Vector] has actually calculated values based upon those mathematical relationships." Def.'s Opp'n [#33] at 13 n.12.

Thus, Iteris's position appears to be the Vantage Vector does not "determine" an ETA unless it actually performs the mathematical calculation of dividing distance by speed to produce a time value. Wavetronix takes a broader view, arguing the Vantage Vector determines ETA when it

---

[5] The most recent iteration of the Vantage Vector User Guide, which Iteris began distributing in approximately September 2013, omits the table. The Vantage Vector's default settings, however, still create a 2.5–5-second dilemma zone. *See infra* n.6 and surrounding text.

[6] As shown in the diagram, the Vantage Vector's "default program settings" are near and far distance thresholds of 100 and 600 feet; a near-distance minimum and maximum speed of 13 and 25 miles per hour; and a far-distance minimum and maximum speed of 75 and 164 miles per hour.

[7] Testimony on the number of values which must be entered into the Vantage Vector in order to create the dilemma zone was somewhat unclear and inconsistent. It appears to the Court six values are inputted into the device: a near distance value, a far distance value, a near-distance minimum speed, a near-distance maximum speed, a far-distance minimum speed, and a far-distance maximum speed. *See* Vantage Vector User Guide at 27 (listing six separate values under "Default Program Settings").

concludes an oncoming vehicle is within the boundaries of the dilemma zone.  Although both parties' definitions fit within the ordinary definition of the word "determine"—the OED defines it both as "[t]o ascertain definitely by observation, examination, calculation, etc." and  as "[t]o conclude from reasoning, investigation, etc. (a thing *to be*, or *that* it is)[8]—the language of the claims suggests "determine" must be read as Wavetronix urges.  Iteris's definition reads "determine" to require a mathematical division, but Claim 22, a dependent claim of Claim 1, claims a method where ETA is estimated by an act of mathematical division.  '542 Patent at col. 30 ll. 30–34 (claiming "[t]he method as recited in claim 19 [which depends from Claim 1], wherein the act of estimating the time-of-arrival of the vehicle to the traffic control point comprise[s] an act of *mathematically dividing* the estimated position by the estimated velocity" (emphasis added)).  Established principles of claim differentiation counsel against importing a limitation from a dependent claim into an independent claim.  *See, e.g.*, *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014) ("'[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.'" (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004))).  The Court therefore construes "determine" in a broader sense, such that a device's ascertainment or conclusion a vehicle has crossed the boundaries of the dilemma zone constitutes a "determination" of ETA.

Having construed the meaning of "determine," the question remains whether Wavetronix has demonstrated a likelihood of success on the question of infringement.  In the opinion of the Court, Wavetronix has shown it is more likely than not the Vantage Vector infringes Claim 1 of the '542

---

[8] OED ONLINE, "determine, v." (Dec. 2014), http://www.oed.com/view/Entry/51244?redirectedFrom=determine& (emphasis in original).

Patent.  There is no dispute the Vantage Vector embodies claim limitations [a] and [d]; the only contentions concern limitations [b] and [c], which respectively require in relevant part the Vantage Vector "us[e] the received sensor data to determine estimated times-of-arrival" to a traffic control point and "determin[e] a level of efficiency and safety . . . based upon the estimated times-of-arrival[.]" '542 Patent at col. 28 ll. 50–57.  The Vantage Vector does both of those things.  First, the Vantage Vector's "received sensor data" consists of speed and distance values which are transferred to the Vantage Vector's internal processor so it may run the algorithm comparing the speed and distance values to the internal dilemma zone presets.  Iteris's chief engineer for roadway sensors, Michael Whiting, testified at hearing that the Vantage Vector's internal dilemma zone presets yield time boundaries for the dilemma zone created—by default, between 2.5 and 5 seconds—and that once a vehicle crosses one of the boundaries, it is between 2.5 and 5 seconds from the intersection.  Since the Vantage Vector compares the speed and distance data it collects via its sensor to the internal dilemma zone presets in order to draw a conclusion whether an oncoming vehicle is within the boundaries of the dilemma zone, thereby determining an estimated time-of-arrival, the Court finds it more likely than not the Vantage Vector embodies claim limitation [b].

Second, and building from that conclusion, the Court further finds it more likely than not the Vantage Vector embodies claim limitation [c].  As explained above, the Vantage Vector uses the speed and distance data it collects to determine whether approaching vehicles fall within the dilemma zone.  If the Vantage Vector detects a vehicle within the zone, the Vantage Vector continuously calls the traffic controller until the vehicle has exited the zone.  *See* Vantage Vector User Guide at 27 ("Continuous mode provides an output any[]time one o[r] more vehicles enters a pre-defined zone.  The output will continue to stay on until all vehicles exit the zone.").  That call

signals the traffic controller to extend the green light such that a collision becomes less likely.  *See* Prelim. Inj. Hr'g Ex. P-3 (Iteris White Paper) at 3 (explaining the Vantage Vector solves the problem of collisions by "detection of the vehicles' presence" in the dilemma zone "and if so, then extending . . . [the] GREEN interval").  By ascertaining whether it is safe for the light to turn yellow or whether it would be safer to extend the length of the green light by reference to the presence of vehicles within the dilemma zone, the Vantage Vector determines a level of efficiency and safety based upon the ETAs of oncoming vehicles.

Because it is more likely than not the Vantage Vector embodies all the limitations of Claim 1, the Court finds Wavetronix has demonstrated a likelihood of success on the question of Iteris's infringement of the '542 Patent.

### 2.    Validity

Even if a patentee shows it will likely prove infringement, the accused infringer can defeat the likelihood of success on the merits by raising a substantial question as to the validity of the patent in suit.  *Trebro*, 748 F.3d at 1169.  Iteris challenges the validity of the '542 Patent on two grounds: first, the '542 Patent is invalid in light of prior art if its claims read upon the Vantage Vector; and second, the '542 Patent is directed at an abstract idea.  The Court finds neither argument raises a substantial question as to the validity of the '542 Patent.

First, the Court rejects Iteris's contention it has raised a substantial question as to invalidity by arguing "the '542 Patent claims cannot encompass the Vantage Vector without invalidating the '542 [P]atent based on the prior art."  Def.'s Opp'n [#33] at 21.  As the Federal Circuit has held, "mere proof that the prior art is identical, in all material respects, to an allegedly infringing product cannot constitute . . . evidence of invalidity."  *Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522

-11-

F.3d 1348, 1363 (Fed. Cir. 2008).  Raising a validity question on grounds of practicing the prior art requires comparing the language of the claims at issue to the prior art, not comparing the characteristics of an allegedly infringing product to the prior art.  *Id.*  As Iteris has failed to make the proper comparison, its first invalidity argument (which, the Court notes, Iteris did not discuss at the hearing) must be rejected.

Second, the Court is unpersuaded by Iteris's abstract-idea argument.  In support, Iteris cites the Supreme Court's recent decision in *Alice Corporation v. CLS Bank International*, 134 S. Ct. 2347 (2014), in which the Court held the concept of intermediated settlement was abstract and a generic computer process implementing the concept was therefore unpatentable.  *Id.* at 2352. Claiming the '542 Patent is similarly directed at an abstract process generically implemented, Iteris contends "a human with no more than a high-school level education can readily accomplish each of the steps taught [by the '542 Patent] with nothing more than a paper and a pencil."  Def.'s Opp'n [#33] at 23.

The Court disagrees, and is unpersuaded *Alice* is applicable to this case.  Merely employing a mathematical formula does not render a claimed method unpatentable where the method improves upon an existing technological process, *Alice*, 134 S. Ct. at 2358 (citing *Diamond v. Diehr*, 450 U.S. 175 (1981)), and the evidence presently before the Court indicates the '542 Patent significantly improved upon existing technological processes for providing dilemma zone protection.  Some previous purported solutions, for example, were based upon virtual loops or physical loops buried in the ground, and did not really solve the problem: for example, those solutions created delays by overextending green lights, failed to account for faster traffic, and required the end user to correctly estimate the speed of the fastest-moving traffic in order to function effectively.  *See* Iteris White

-12-

Paper at 3–4 (describing the problems with loop-based solutions to the dilemma zone problem). Wavetronix improved upon those solutions by devising a process which by making use of a mathematical formula enables accurate real-time tracking of vehicles as they approach an intersection.

The '542 Patent does not claim the mathematical formula itself, the concept of the dilemma zone, or an unimproved application of either. The Court therefore finds Iteris's argument fails to raise a substantial question as to the validity of the '542 Patent. *See Diehr*, 450 U.S. at 187 (rejecting abstract-subject-matter argument where the process at issue "admittedly employs a well-known mathematical equation, but . . . do[es] not seek to pre-empt the use of that equation" and instead "seek[s] only to foreclose from others the use of that equation in conjunction with all of the other steps in the[] claimed process").

**B.      Irreparable Injury**

"[T]he central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be compensated by money damages." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). As the Supreme Court has explained, the "key word in this consideration is irreparable. Mere injuries, however substantial, . . . are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90–91 (1974) (internal quotation marks and citation omitted).

Wavetronix alleges it will suffer irreparable harm without an injunction for four reasons:

(1) lost market share; (2) loss of the right to exclude competitors; (3) price erosion; and (4) loss of reputation. According to Wavetronix, these harms "follow[] directly" from the fact Wavetronix was, before Iteris's alleged infringement, the sole supplier in the market for dynamic dilemma zone protection products. Wavetronix claims Iteris has created a two-supplier market by offering the Vantage Vector at a "deeply discounted" price and stealing Wavetronix's customers, and argues it must therefore either lower its prices, or ruin its relationships with customers and "ultimately be forced from the market" by refusing to do so. Pl.'s Reply [#37-1] at 26.

Iteris counters Wavetronix's complaint of harm to its exclusive rights in the patent is insufficient to demonstrate irreparable harm, Wavetronix's arguments concerning loss of business fare no better, as such loss is compensable through money damages, and Wavetronix's claims of future price erosion and loss of market share are speculative and unproven. Finally, Iteris claimed at hearing the Vantage Vector is in fact often sold at a higher price than the Advance, as evidenced by publicly available information on construction-contract pricing.

The Court acknowledges Wavetronix has presented some evidence it will be harmed absent a preliminary injunction. First, it is undisputed that the parties are the sole competitors in the marketplace for radar-based dynamic dilemma zone protection. Direct competition in a two-supplier market does suggest the potential for irreparable harm flowing from infringement, as "it creates an inference that an infringing sale amounts to a lost sale for the patentee[.]" *Robert Bosch LLC v. Pylor Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011). Additionally, Wavetronix has never licensed the '542 Patent, in accord with its stated commercial strategy of investing in research and development with an aim toward innovation and product differentiation, suggesting exclusivity is important to its business model. *See* Pl.'s Mot. Prelim. Inj. [#15-5] (sealed) (Arnold Decl.) ¶ 5.

-14-

Wavetronix has also offered evidence Iteris has poached at least three construction contracts from Wavetronix by offering the Vantage Vector to contractors at a lower price, and, if not enjoined, threatens to poach five more. *Id.* [#15-4] (sealed) (Lee Decl.) ¶¶ 13–14. All of this weighs in favor of a finding of irreparable harm.

Wavetronix's claim its reputation will be damaged absent an injunction stands on shakier ground. Wavetronix states it has established a reputation for distinctiveness and innovation by investing heavily in research and development such that it can differentiate itself from its competitors by offering interesting products rather than by merely setting low prices, and argues Iteris's alleged infringement will damage that reputation absent an injunction. Wavetronix points to *Douglas Dynamics, LLC v. Buyers Products Co.*, in which the Federal Circuit found irreparable harm in part because the patentee's reputation as an innovator would be damaged if customers found the patentee's purported innovations in other products. 717 F.3d 1336, 1344–45 (Fed. Cir. 2013). The relationship between the patentee and infringer in *Douglas Dynamics*, however, was materially different than the relationship between Wavetronix and Iteris; in *Douglas Dynamics*, the infringer's "products [were] considered less prestigious and innovative" than the patentee's, and the infringer "made its place in the market by . . . capitaliz[ing] on its similarity to the better product[.]" *Id.* at 1344, 45. Here, there is no evidence the Vantage Vector is an inferior or cut-rate version of the Advance, or that Iteris's products are considered less innovative or prestigious than Wavetronix's. And although Wavetronix is correct that protecting and fostering innovation is a major goal of the patents system, if harm to one's reputation as an innovator flowing from loss of the right to exclude others from using the patented invention was sufficient to demonstrate irreparable harm, every patentee could do so.

Further, Wavetronix's forecast of future lost sales, price erosion, and eventual excision from the market may be, at least in part, speculative. As noted above, Iteris challenged Wavetronix's argument the Vantage Vector is consistently priced lower than the Advance at hearing, eliciting some confusing testimony (that at times veered into hearsay) as to the price of the complete Advance and Vantage Vector *systems* versus the price of the *sensors* alone. Moreover, while Wavetronix argues Iteris is marketing the Vantage Vector at a price twenty to thirty percent lower than the price attached to the Advance, *see* Lee Decl. ¶ 15, testimony at hearing indicated the Advance is marketed, at least in some commercial applications, at a price slightly *higher* than the Vantage Vector. Finally, both parties acknowledge the price of their products may change from commercial contract to contract. All of the above leaves the Court unclear as to whether the non-quantifiable threat to Wavetronix from sales of the Vantage Vector during the pendency of this litigation looms as large as Wavetronix represents, weighing against a finding of irreparable harm.

Finally, the damages suffered by Wavetronix thus far are quantifiable, and Wavetronix estimates the total value of its lost sales, including the jobs poached by Iteris, at a rather low figure.[9] If Wavetronix prevails, there is no evidence Iteris would be unable to pay a money judgment compensating Wavetronix as appropriate. Taking all of the above into consideration, the Court is not persuaded Wavetronix will suffer irreparable harm if an injunction does not issue at this time.

## C.    Balance of Harms & Public Interest

As the Court finds Wavetronix has failed to demonstrate irreparable harm on the present record, the remaining factors—balance of the harms and the public interest—need not be examined for denial of the motion for preliminary injunction to be proper. *See, e.g., Amazon.com, Inc. v.*

---

[9] Wavetronix has designated the precise dollar amount as attorney's eyes only.

*Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (movant cannot be granted a preliminary injunction unless it establishes both of the first two factors). Nevertheless, the Court has examined the remaining factors (again, on the present record), and is of the opinion both favor Iteris. Concerning the public interest, Iteris correctly notes contracts with municipalities are subject to a long and complex bidding and approval process which can extend over several years. While Wavetronix clarifies it "does not seek an injunction requiring Iteris to remove [the Vantage Vector] from light poles[,]" Pl.'s Reply [#37-1] at 26, given the length of time and number of steps which must take place before a product is approved for use, a preliminary injunction would harm those municipalities which have already contracted with Iteris. *See* Def.'s Opp'n [#33-1] (sealed) (Kreter Decl.) ¶ 16 (explaining why the process of switching to a different product is a lengthy one for municipalities).

As to balance of the harms, although Wavetronix is correct that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected[,]" Pl.'s Mot. Prelim. Inj. [#15] at 30 (quoting *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008)), that maxim, developed in the context of a permanent injunction, *see id.*, loses some of its force in the context of a preliminary injunction, where the question of infringement has yet to be conclusively litigated. Wavetronix remains the dominant player in the market for dynamic dilemma zone protection, and the Vantage Vector is in its infancy. Because the approval process for municipal contracts is so lengthy and slow, an injunction against Iteris, even if the Vantage Vector is ultimately found not to infringe, could functionally exclude Iteris from the market long after this litigation has reached its end. Iteris thus stands to suffer the greater harm.

## Conclusion

A final note: the Court believes once a *Markman* order construing the disputed claim language is entered, this case will be readily resolvable on summary judgment. Although the Court denies Wavetronix's request for injunctive relief at the present time, as previously indicated, the denial is without prejudice to Wavetronix's right to file a request for permanent injunctive relief along with a motion for summary judgment.

Accordingly,

IT IS ORDERED that Plaintiff Wavetronix, LLC's Motion for Leave to File Reply Brief in Support of Motion for Preliminary Injunction Under Seal [#37] is GRANTED;

IT IS FINALLY ORDERED that Plaintiff Wavetronix, LLC's Motion for Preliminary Injunction [#15] is DENIED WITHOUT PREJUDICE to Plaintiff's right to file for permanent injunctive relief along with any motion for summary judgment.

SIGNED this the 21ˢᵗ day of January 2015.

SAM SPARKS
UNITED STATES DISTRICT JUDGE